# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

JUDY A. FOSTER-MCVEY,        )
    Plaintiff              )
                       )
                       )    Civil Action No. 1:15cv00011
                       )    **MEMORANDUM OPINION**
CAROLYN W. COLVIN,         )
 **Acting Commissioner of Social Security,** )    By: Pamela Meade Sargent
    Defendant           )    United States Magistrate Judge

## I. Background and Standard of Review

Plaintiff, Judy A. Foster-McVey, ("Foster-McVey"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Foster-McVey has requested oral argument in this matter, but the court will deny that request based on its finding that the parties' briefs have adequately addressed the relevant issues.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.""" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Foster-McVey protectively filed her application for SSI on August 17, 2011, alleging disability as of April 1, 2004, due to severe depression, panic attacks, problems concentrating and understanding things, angry outbursts, back problems, high blood pressure, possible diabetes, thyroid problems, sinus problems, irritable bowel syndrome, hernia, anxiety and gastroesphogeal reflux disease. (Record, ("R."), at 13, 202-08, 214, 227.) The claim was denied initially and on reconsideration. (R. at 13, 90-102, 104-19, 121-25, 128, 131-33, 135-37.) Foster-McVey then requested a hearing before an administrative law judge, ("ALJ"). (R. at 138-40.) A video hearing was held on October 16, 2013, at which Foster-McVey was represented by counsel. (R. at 13, 27-65.)

By decision dated November 6, 2013, the ALJ denied Foster-McVey's claim. (R. at 13-21.) The ALJ found that Foster-McVey had not engaged in substantial gainful activity since August 17, 2011, the date of her application. (R. at 15.) The ALJ determined that the medical evidence established that Foster-McVey suffered from severe impairments, namely bipolar disorder, borderline intellectual functioning, personality disorder, obesity, irritable bowel syndrome and a hernia, but he found that Foster-McVey did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-17.) The ALJ found that Foster-McVey had the residual functional capacity to perform simple, easy-to-learn, repetitive,

unskilled light work,[1] that did not require more than six hours of standing and/or walking in an eight-hour workday and six hours of sitting in an eight-hour workday; that did not require more than occasional climbing of ramps and stairs, kneeling, crouching, stooping and interaction with co-workers and supervisors; that did not require climbing ladders, ropes or scaffolds, crawling, interacting with the public, concentrated exposure to vibration or hazards and which was in a static work environment with few changes in work routines and settings. (R. at 17-19.) The ALJ found that Foster-McVey had no past relevant work. (R. at 19.) Based on Foster-McVey's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Foster-McVey could perform, including jobs as an assembler, an inspector/tester/sorter and a packer. (R. at 20.) Thus, the ALJ found that Foster-McVey was not under a disability as defined by the Act and was not eligible for SSI benefits. (R. at 21.) *See* 20 C.F.R. § 416.920(g) (2015).

After the ALJ issued his decision, Foster-McVey pursued her administrative appeals, (R. at 7-9), but the Appeals Council denied her request for review. (R. at 1-4.) Foster-McVey then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2015). The case is before this court on the Commissioner's motion for summary judgment filed September 25, 2015.

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2015).

Case 1:15-cv-00011-PMS   Document 19   Filed 09/28/16   Page 3 of 33   Pageid#: 1116

## II. Facts

Foster-McVey was born in 1977, (R. at 19), which, at the time of the ALJ's decision, classified her as a "younger person" under 20 C.F.R. § 416.963(c). Foster-McVey completed the eighth grade in school. (R. at 35.) Foster-McVey testified that she could not work due to a hernia in her upper right stomach and depression, anxiety and bipolar issues. (R. at 37.) Foster-McVey stated that her hernia was painful and that it would "pull" any time she attempted to lean over to pick anything up. (R. at 39.) Foster-McVey also stated that she suffered from irritable bowel syndrome with diarrhea and cramping. (R. at 41.) She said that she would use the restroom with diarrhea three to four times a day. (R. at 41.) Foster-McVey stated, at her hearing, that she did not take any medication because she could not afford any. (R. at 42.) Foster-McVey testified that she also suffered from back pain that radiated down her buttocks into her right leg and foot. (R. at 49.)

Foster-McVey testified that her bipolar disorder caused her to have "really bad mood swings." (R. at 43.) She also said that sometimes she would go without sleep for a week at a time. (R. at 43.) Foster-McVey admitted that she had cut her wrists on four prior occasions, but she said that these acts were not suicide attempts. (R. at 44.) Instead, she said the cutting provided her with a "release." (R. at 44.) Foster-McVey stated that she usually stayed to herself and did not attend church or family outings. (R. at 44.) She said that she spent most of her day sitting or lying in her room. (R. at 48.) She also said that she gets so depressed that she sometimes does not bathe for multiple days. (R. at 51.)

John Newman, a vocational expert, also was present and testified at Foster-McVey's hearing. (R. at 52-63.) Newman was asked to consider a hypothetical

-4-

individual of Foster-McVey's age, education and no work history, who had the residual functional capacity to perform only simple, easy-to-learn, repetitive, unskilled medium[2] work at a steady work environment with few changes in work routine, who could stand and/or walk for a total of about six hours in an eight-hour workday and could sit with normal breaks for about six hours in an eight-hour workday, who could frequently stoop, kneel, crouch and climb ramps and stairs but could only occasionally climb ladders, ropes and scaffolds and crawl, who should avoid concentrated exposure to hazards such as dangerous machinery and unprotected heights and who should not interact with the public, but could occasionally interact with supervisors and co-workers. (R. at 54-55.) Newman identified jobs that existed in significant numbers at the medium, unskilled level that such an individual could perform, including jobs as a mold assembler, a packer and a linen room attendant. (R. at 55-56.) Newman was asked to consider the same hypothetical individual, but who had the residual functional capacity to perform light work that did not require more than occasional kneeling, crouching, stooping, bending and climbing of ramps and stairs and did not require any climbing of ladders, ropes or scaffolds or crawling. (R. at 56-57.) He identified jobs that existed in significant numbers at the light, unskilled level that such an individual could perform, including jobs as an assembler, a packer and an inspector/tester/sorter. (R. at 57.)

In rendering his decision, the ALJ reviewed records from Walnut Grove Family Medicine; Highlands Community Services; Cumberland Mountain Community Services; Johnston Memorial Hospital; Appling Hospital; Kathy Jo

_____

[2] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 416.967(c) (2015).

Miller, M.Ed.; Robert S. Spangler, Ed.D.; Dr. Leticia Peltzer, M.D.; Robert Keeley, a state agency medical consultant; Dr. Andrew Bockner, M.D., a state agency physician; Louis Perrot, Ph.D., a state agency psychologist; and Dr. Robert McGuffin, M.D., a state agency physician.

The medical records show that Foster-McVey sought treatment for anxiety and depression as early as 2003, (R. at 307, 309, 815-17), and she sought treatment for back pain as early as 2004. (R. at 299-302, 794-96, 801-02, 822-24, 829-31, 849, 858-59, 861-62.) In 2004, she sought treatment at an emergency department for possible seizures. (R. at 759-60, 772-75.)

On December 25, 2009, Foster-McVey sought treatment at the emergency department of Johnston Memorial Hospital, ("JMH"), for complaints of vomiting and diarrhea. (R. at 378-83.) She had full normal range of motion and muscle strength in her extremities. (R. at 379.) Her abdomen was not tender to palpation. (R. at 379.) Foster-McVey was diagnosed with irritable bowel syndrome and told to follow up with her regular physician. (R. at 380.) Foster-McVey again sought treatment at the JMH emergency department for complaints of vomiting without diarrhea on January 7, 2010. (R. at 367-69.) According to Foster-McVey, she recently had eaten some barbecue potato chips, and she becomes sick whenever she eats spicy food. (R. at 367.) She complained of mild abdominal tenderness upon palpation in the left lower quadrant of her abdomen. (R. at 368.) She was diagnosed with dehydration due to vomiting, treated and discharged. (R. at 369.)

On September 4, 2010, Foster-McVey sought treatment at the JMH emergency department for complaints of shoulder pain due to "using the computer." (R. at 356.) On this date, she did not complain of any abdominal pain.

-6-

An examination revealed normal findings, full range of motion in all of her joints and extremities, with the exception of pain in right shoulder. (R. at 357.) The physician diagnosed acute myofascial strain, gave Foster-McVey a prescription for Darvocet-N, Flexeril and ibuprofen and discharged her. (R. at 357.)

On November 16, 2010, Foster-McVey was treated and released at the JMH emergency department for right upper quadrant abdominal pain with diarrhea and nausea. (R. at 338-41.) Foster-McVey gave a history of thyroid problems, a hiatal hernia and irritable bowel syndrome. (R. at 338.) Physical examination on this date was, in large part, normal except for some moderate abdominal tenderness upon palpation in the right upper quadrant. (R. at 339.) Examination of Foster-McVey's back showed normal, painless range of motion. (R. at 339.) Her behavior/mood was noted as "pleasant, cooperative." (R. at 339.)

Foster-McVey was examined by Dr. J. Burt Banks, M.D., with Walnut Grove Family Medicine, on September 14, 2010. (R. at 391-93). She told Dr. Banks that she had a history of hypothyroidism, allergic rhinitis, earache worse on left, gastroesophageal reflux disease, irritable bowel syndrome and a sleep disorder. (R. at 391.) Foster-McVey stated that her symptoms of irritable bowel syndrome were intermittent with migratory abdominal pain and alternating constipation and diarrhea. (R. at 391.) Dr. Banks noted that Foster-McVey consumed a large amount of caffeinated drinks each day. (R. at 392.) Dr. Banks stated that Foster-McVey was obese, and he listed her height at 5 feet, 6 inches and her weight as 245 pounds. (R. at 391-92.) He did note some epigastric tenderness. (R. at 393.) Foster-McVey did not complain of any back problems, and Dr. Banks did not diagnose any musculoskeletal problems.

-7-

Foster-McVey returned to see Dr. Banks on October 5, 2010, and stated that her stomach cramps and bloating had gotten worse over the previous few weeks. (R. at 394.) She also complained of acid reflux symptoms and pain from a hiatal hernia. (R. at 394.) Dr. Banks noted some epigastric tenderness. (R. at 395.) Dr. Banks changed Foster-McVey's medication for both acid reflux and irritable bowel syndrome. (R. at 395.)

On November 19, 2010, Foster-McVey told Dr. Banks that she had sought treatment in the emergency room that week due to increased cramping, pain and diarrhea. (R. at 397.) Foster-McVey's weight was listed at 250 pounds. (R. at 397.) Dr. Banks again noted epigastric tenderness. (R. at 398.) He, again, changed her medications for acid reflux and irritable bowel syndrome. (R. at 398.) On November 23, 2010, Foster-McVey returned for treatment of an ear infection, and she reported that her irritable bowel symptoms had improved. (R. at 400.)

On January 6, 2011, Foster-McVey saw Dr. Banks with complaints of a cough and diarrhea. (R. at 403.) Dr. Banks diagnosed sinusitis and prescribed an antibiotic. (R. at 404.) Dr. Banks's note makes no mention of any complaint of back pain. (R. at 403-04.) He did record that Foster-McVey was then taking Tylenol with codeine, but he did not note why. (R. at 403.) Foster-McVey saw Dr. Banks again on February 2, 2011, for complaints of continued ear pain, congestion and cough and intermittent irritable bowel symptoms, alternating from constipation to diarrhea. (R. at 456.) On this occasion, Foster-McVey also reported that she took Tylenol with codeine for pain. (R. at 456.)

On January 13, 2011, Foster-McVey sought treatment at the JMH emergency department for back pain for the past several years. (R. at 543-45.) She

-8-

complained of intermittent flare-ups of lower back pain with radiation into her right buttocks and right lateral thigh. (R. at 543.) She said the pain was worse with excessive walking or bending. (R. at 543.) She stated that she could not treat with her primary physician because he would no longer prescribe medication for her back pain. (R. at 543.) She did not, however, report that she was taking Tylenol with codeine for pain, as she had informed Dr. Banks. It was noted that Foster-McVey appeared comfortable and in no acute distress. (R. at 543.) She had normal range of motion in her back with no vertebral tenderness noted. (R. at 544.) There was some muscle spasm in her right low back. (R. at 544.) Strength and muscle tone was normal in all extremities. (R. at 544.) Gait and deep tendon reflexes were normal. (R. at 544.) She was discharged with a prescription for Flexeril. (R. at 544.)

On February 7, 2011, Foster-McVey was seen by Dr. Leticia Peltzer, M.D., at the Ear, Nose & Throat Specialty Center, for complaints of sinus and ear problems and cough. (R. at 415.) Foster-McVey complained of chronic ear pain for six years, with the left side worse, and a cough for the previous month. (R. at 415.) Dr. Peltzer diagnosed TMJ syndrome with atypical facial pain and sinusitis, acute. (R. at 416.)

Foster-McVey also completed a medical history form for Dr. Peltzer on which she complained of  weight change, fevers, sweats, fatigue, double vision, chronic cough, shortness of breath, acid reflux, tinnitus, stopped up/plugged ears, pain in her ears, dry/itchy ears, water in ears, room/head spinning, daily dizziness, headache, feeling depressed, anxiety, carpal tunnel syndrome, enlarged lymph nodes, allergies, sneezing, itchy watery eyes, stuffiness/congestion, bleeding from her nose, drainage, discomfort, sinus pressure, cheek/tooth pain, hoarseness,

difficulty swallowing, throat clearing, sore throat, swollen tonsils, mouth breathing, heartburn, sour taste in mouth and sleep apnea. (R. at 417-18.) She denied any osteoarthritis on this medical history, (R. at 417-18), but listed that she suffered from a back problem on another form. (R. at 420.) She did not report any narcotic pain medication.

Dr. Peltzer ordered physical therapy for Foster-McVey for TMJ pain, neck pain and postural abnormality, and Foster-McVey was evaluated by Barret E. Blevins, P.T., D.P.T., with Mountain States Rehabilitation, on May 6, 2011. (R. at 445-48.) Blevins said that his evaluation of Foster-McVey showed TMJ disorder and effusion, posture imbalance, increased jaw/neck/upper shoulder pain, musculature weakness, soft tissue dysfunction, increased headache frequency and decreased function, activities of daily living performance. (R. at 445.)  Foster-McVey reported a two-year history of TMJ pain with no known cause. (R. at 446.) She reported difficulty sleeping, hearing and yawning with two to three headaches a day. (R. at 446.) She complained of aching, sharp, occasionally throbbing pain in her right jaw and face, posterior neck and forehead. (R. at 446.) She said that yawning, chewing food or gum or swallowing pills aggravated her symptoms and that her symptoms were eased with pain medication and relaxation and rest.  (R. at 446.)  Foster-McVey stated that her symptoms were an annoyance rather than an impairment or disabling, yet she rated her pain an 8 on a 10-point scale. (R. at 446.)

On February 11, 2011, Foster-McVey sought treatment at Johnston Memorial Hospital for a fall in the bathtub and fracture of her sacrum/coccyx. (R. at 535-38.) She complained that it hurt to sit or bend, but she denied any pain anywhere else. (R. at 536.) The examining physician noted vertebral tenderness at

the coccyx with painful range of motion. (R. at 537.) She was discharged with a prescription for Lortab. (R. at 538.)

On March 9, 2011, Kathy Jo Miller, M.Ed., and Robert S. Spangler, Ed.D., performed a consultative psychological evaluation of Foster-McVey at the state agency's request. (R. at 422-28.) Foster-McVey appeared clean, neat, appropriately dressed, and she was wearing makeup, jewelry and heavy perfume. (R. at 422.) It was reported that she seemed socially confident and comfortable during the evaluation and understood the instructions and demonstrated good concentration. (R. at 422.) Foster-McVey said that she was seeking disability benefits because of "depression and anxiety. I have a really bad problem around people I don't know." (R. at 423.)

She reported that she had suffered a panic attack two weeks earlier, for which she sought treatment at the emergency room.[3] (R. at 423.)  She stated that she was given a prescription for Xanax at the emergency room, which worked well. (R. at 423.) She stated that her primary physician then gave her a prescription for BuSpar, which made her "more angry" and, then, Klonopin.[4] (R. at 423.) Foster-McVey stated that she had never been to a psychiatrist or a mental health center. (R. at 423.) She claimed that she had a history of suicidal ideation in the past, "but not lately." (R. at 423.) She said that these suicidal thoughts had occurred after her adoptive mother died in 2006. (R. at 423.) She reported that she had five to six panic attack and "two nervous breakdowns" since she had moved to Virginia. (R. at 423.) She described her nervous breakdowns as "I just went

_____

[3] There is no record of this treatment contained in the administrative record.

[4] Dr. Banks's records make no mention of any psychological complaints other than difficulty sleeping prior to this date. While Dr. Banks's November 19, 2010, note reflects that Foster-McVey was taking Klonopin, there is no record that Dr. Banks had prescribed it for her.

bizerk." (R. at 423.) She said that she went to the hospital and was given Xanax to calm her down. (R. at 423.)

Foster-McVey reported adequate sleep, but diminished appetite due to the impact of irritable bowel syndrome and a hernia. (R. at 423.) She admitted, however, that she had only lost two pounds. (R. at 423.) She said that she left school in the ninth grade due to a pregnancy. (R. at 424.) She reported being in special education classes in reading and mathematics from the second grade until she left school. (R. at 424.) She was retained in the fifth grade. (R. at 424.) Foster-McVey said that she had been married and divorced two times and had four children, none of whom she was then currently raising. (R. at 424.) Foster-McVey said that she had never worked more than two days at a job and had not attempted any employment in the past six or seven years. (R. at 424.)

It was noted that Foster-McVey was alert and oriented times three. (R. at 424.) Her mood and affect were within normal limits. (R. at 424.) There were no vegetative symptoms of depression or anxiety noted. (R. at 424.) She was pleasant, cooperative and personable. (R. at 424.) Her speech was of normal rate and rhythm, and she maintained good eye contact. (R. at 424.) She repeated three of three words after five minutes, five numbers presented serially and four backwards, but she did not get the concept of serial 7s or serial 3s after several attempts at explanation. (R. at 424.) She completed simple math problems quickly and correctly. (R. at 424.) She identified the current and past two presidents, and her interpretation of two common proverbs was appropriate. (R. at 424.)

It was noted that she appeared to be of borderline intelligence and was emotionally anxious. (R. at 424.) The report states that Foster-McVey's social

skills were adequate, she related well, was polite and cooperative and communicated in a clear, coherent manner. (R. at 425.) It was opined that she had the judgment necessary to handle her own financial affairs. (R. at 425.) Based on intellectual testing, Foster-McVey's full-scale IQ score was 71, which is at the lower limits of the borderline range of intelligence. (R. at 426.)

Foster-McVey stated that she "sits around" most of the day, although she regularly washed dishes and occasionally helped with laundry. (R. at 424.) She said that if she tried to do any heavy housework, her back "locks up or my stomach starts hurting and I have to go to the bathroom." (R. at 425.) She reported that she had bowel movements about four times a day. (R. at 425.) She stated that she did not have any friends. (R. at 425.) She said that she played games on the internet. (R. at 425.)

Foster-McVey was diagnosed with anxiety disorder, mild; borderline intellectual functioning; marginal educational levels in reading and math; and personality disorder with dependent features. (R. at 427.) Her then-current Global Assessment of Functioning, ("GAF"),[5] score was assessed at 65.[6] (R. at 427.) It was noted that she might benefit from some type of job training and individual supportive therapy. (R. at 427.) Miller and Spangler stated that Foster-McVey's ability to understand and remember was limited by her borderline intellectual functioning and marginal education, but was adequate for simple instructions. (R.

---

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[6] A GAF score of 61 to 70 indicates "[s]ome mild symptoms … OR some difficulty in social, occupational, or school functioning, … but generally functioning pretty well…." DSM-IV at 32.

at 428.) They also stated that her ability to sustain concentration and persistence was adequate, but that her social interaction was limited by anger and irritability, secondary to anxiety disorder. (R. at 428.) They also stated that her ability to adapt was limited by poor decision-making skills, secondary to personality disorder with dependent features, anxiety disorder, mild with medication, borderline intellectual functioning and marginal education. (R. at 428.)

On March 31, 2011, Foster-McVey sought mental health treatment with Highlands Community Services Center for Behavioral Health for issues with depression and anger and mood swings over the previous 10 years. (R. at 430.) When asked if she suffered from any psychological symptoms that had a significant impact on her quality of life and day-to-day functioning, Foster-McVey reported that she suffered from moderate depressed mood, sleep disturbance, mood swings and significant weight gain/loss. (R. at 430.) When asked if she suffered from any psychological symptoms that impacted her quality of life, but had no significant impact on her day-to-day functioning, she reported that she suffered from mild fatigue or low energy, emotionality, anxiety, aggressive behavior, guilt, appetite disturbance, elimination disturbance, agitation, irritability, panic attacks, limited social skills, elevated mood and self-mutilation. (R. at 430.) She reported no psychological symptoms that had a profound impact on her quality of life or day-to-day functioning. (R. at 430.) She reported her leisure activities as playing video games and shopping. (R. at 431.)

Foster-McVey reported that she had been sexually and verbally abused as a child. (R. at 431.) She said that she completed the ninth grade in school and did not report ever being retained, having an individualized education plan, ("IEP"), or experiencing any academic problems. (R. at 431.) Foster-McVey stated that she

had been seen for mental health issues on only one occasion in the past. (R. at 433.) She denied any prior hospitalizations for mental health issues. (R. at 433.) Foster-McVey was diagnosed with major depression, recurrent, moderate; and post-traumatic stress disorder. (R. at 434.)

Foster-McVey returned to Dr. Banks for treatment of a rash on both legs and complaints of dizziness and feeling nauseated on April 14, 2011. (R. at 459.) She complained of continuing ear pain and increased symptoms when moving her head up and down. (R at 459.)  She reported that she was taking Cipro for her sinuses and that the rash on her legs appeared after using a tanning bed. (R. at 459.) Foster-McVey returned on June 22, 2011, with complaints of an occasional sensation of her heart skipping with shortness of breath when she was anxious or overheated. (R. at 463.)

On May 5, 2011, Foster-McVey saw Cetrina Ratliff, F.N.P., for complaints of abdominal pain and acid reflux. (R. at 529-32.) Foster-McVey complained of significant epigastric pain that went through her back, especially after eating and with bowel movements. (R. at 529.) She said that the area seemed to throb or have a pulsating sensation. (R. at 529.) She also complained of intermittent diarrhea. (R. at 529.) Foster-McVey gave a medical history of high cholesterol, thyroid problems, hemorrhoid problems, obesity, hiatal hernia and a previous blood transfusion. (R. at 529.) She also complained of generalized pain, generalized weakness, some fever and chills, weight loss, fatiguing easily, headaches, sinus pain, problems with eyesight, earache, nosebleed, swollen glands, daytime sleepiness, leg pain, recent cold symptoms with shortness of breath, heartburn, nausea, abdominal pain, getting full quickly when eating, constipation, diarrhea, change in or irregular bowel movements, pain or burning on urination, difficulty

-15-

voiding, change in urinary habits, frequent nocturia, hesitancy, urgency and voiding large amounts, pain upon intercourse, excessive thirst, flushing, feelings of weakness, heat/cold intolerance, abnormal sweating, bruising joint aches, muscle aches and cramps, dizziness, numbness in the fingers, sleep disturbances and anxiety/depression. (R. at 530-31.) Ratliff recommended and scheduled a esophagogastroduodenoscopy. (R. at 531-32.) This procedure was performed by Dr. William T. Cummins, M.D., on May 5, 2011, at JMH. (R. at 526-28.) The procedure revealed that Foster-McVey suffered from a hiatal hernia and mild esophagitis. (R. at 526, 533.)

Foster-McVey was seen again at Dr. Banks's office on June 22, 2011. (R. at 974-75.) Her examination was normal. (R. at 974-75.)

Foster-McVey was admitted to JMH overnight on June 28, 2011, for complaints of chest pain with radiation into her left arm and shortness of breath after one-two weeks of heart palpitations. (R. at 449-52, 511-14.) She was discharged the next day with orders for an outpatient stress test. (R. at 449.) A nuclear stress test performed on June 30, 2011, was normal with no evidence of heart attack. (R. at 495, 497.)

On July 1, 2011, Foster-McVey saw Dr. Gregory H. Miller, M.D., at JMH to have a Holter moniter placed to record incidents involving palpitations and shortness of breath. (R. at 496.)

On August 24, 2011, Foster-McVey sought treatment at the JMH emergency department with complaints of pelvic pain and pain and burning upon urination with frequency and urgency. (R. at 618-21.) A CT scan of her abdomen and pelvis

was normal other than showing that she previously had a hysterectomy. (R. at 626.) She was diagnosed with a urinary tract infection and given a prescription for an antibiotic and Lortab. (R. at 620.)

On September 3, 2011, Foster-McVey had x-rays taken at Bristol Regional Medical Center of her left ankle, which showed no indication of fracture or subluxation. (R. at 470.)

On September 24, 2011, Foster-McVey was treated and released from the JMH emergency department for a superficial cut to her left wrist. (R. at 482.) She reported that she just became very angry and exploded, cutting herself with a box cutter, after her boyfriend asked her to peel some potatoes. (R. at 482.) She denied wanting to kill herself, but she complained of anxiety, depression and feeling out of control at times. (R. at 482.) She also complained of crying and mood swings. (R. at 482.)

Heather Hamm, with Cumberland Mountain Community Services, conducted a Crisis Stabilization Assessment of Foster-McVey after she arrived at the emergency department. (R. at 437-38.) According to the Assessment, an emergency room physician checked Foster-McVey's wrist and concluded there was a superficial cut to left wrist requiring no treatment. (R. at 437.) Foster-McVey said that she was having a hard time dealing with "things." (R. at 437.) She reported that she had been sexually assaulted as a child and that "nobody would help" her.  (R. at 437.) She said that she became "very sick" when her mother passed away. (R. at 437.) She said that she was in an abusive relationship, and she sometimes felt that she "would be better off with her mother in heaven." (R. at 437.) She stated that she did not hurt herself worse earlier in the day because she

-17-

had good support from her current boyfriend and his mother. (R. at 437.) She stated that she just got the "overwhelming urge" to hurt/cut herself sometimes. (R. at 437.) Foster-McVey denied any suicidal or homicidal ideations. (R. at 437.)

Hamm noted that Foster-McVey was alert and oriented times four; her mood was depressed/anxious; and her appearance, affect and memory were within normal limits. (R. at 437.) Foster-McVey reported that her sleep had been normal and that she typically awoke rested with enough energy throughout the day. (R. at 437.) She said that her appetite was normal. (R. at 437.) Hamm stated that her thought processes and content were normal, and her thoughts were organized, logical, linear and goal-directed. (R. at 437.) While Hamm said that Foster-McVey's insight was within normal limits, she said that her judgment was impaired. (R. at 437.) She stated that Foster-McVey contracted for her safety and agreed to contact Highlands Community Services for follow up the next week. (R. at 437.)

Foster-McVey was seen by Highlands Community Services psychiatrist Dr. Shaji Puthuvel, M.D., on September 27, 2011. (R. at 583-86.) Foster-McVey reported making superficial cuts to her wrist the previous week after an argument with her daughter and boyfriend. (R. at 584.) She said that she cut herself for stress relief and denied any suicidal thoughts in the past five years. (R. at 584.) She said that she avoided crowds, and Dr. Puthuvel noted that she appeared mildly anxious. (R. at 584.) She denied any suicidal or homicidal ideations, intent or plan, auditory or visual hallucinations, hopelessness or helplessness. (R. at 584.) She did state that she had paranoia in the form of thoughts that people were looking at her and judging her. (R. at 584.) She also said that her sleep, appetite and energy level were poor. (R. at 584.)

-18-

Dr. Puthuvel noted that Foster-McVey was alert, attentive and oriented, calm and cooperative with appropriate grooming and no psychomotor retardation or agitation. (R. at 585.) Her speech was of normal rate and rhythm; her mood was "nervous;" her affect was congruent with her mood; her thought process was normal, coherent with no loosening of associations or unusual thought content; her insight was fair, judgment good, memory intact and fund of knowledge average. (R. at 585.) Dr. Puthuvel diagnosed bipolar I disorder with history of post-traumatic stress disorder and rule out borderline personality disorder. (R. at 585.) He prescribed Lithium and Rozerem and supportive individual therapy. (R. at 586.) Dr. Puthuvel assessed her GAF score at 50.[7] (R. at 586.)

Foster-McVey returned to see Dr. Puthuvel on October 11, 2011. (R. at 586-88 .) On this occasion, Foster-McVey and her boyfriend reported that she was doing well on lithium, but she said she had gained weight. (R. at 587.) Her weight was listed at 256. (R. at 587.) Dr. Puthuvel stated that Foster-McVey appeared mildly anxious. (R. at 587.) She denied suicidal or homicidal ideations, intent or plans, auditory and visual hallucinations, thought broadcasting/insertion/with-drawal, ideas of reference or feelings of impending doom. (R. at 587.) She stated that she had difficulty sleeping and related a history of episodes consistent with mania with decreased need for sleep and increased energy level, grandiosity, impulsivity, hyperverbal, pressured speech and increased productivity. (R. at 587.) Dr. Puthuvel noted that Foster-McVey was alert, attentive, oriented, calm and cooperative, with appropriate grooming and no psychomotor retardation or agitation. (R. at 587.) He noted that her mood was nervous; her affect was congruent with mood; her thought processes were normal, coherent with no

_____

[7] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

loosening of associations and no unusual thought content; her insight was fair; her judgment was good; her memory intact and her fund of knowledge average. (R. at 588.) Dr. Puthuvel's diagnosis and assessment of Foster-McVey's GAF score remained unchanged. (R. at 588.)

A blood test performed on October 19, 2011, showed that Foster-McVey did not have lithium present in her bloodstream at therapeutic levels. (R. at 612.)

She returned to see Dr. Puthuvel on November 14, 2011. (R. at 589-91.) On this occasion, Foster-McVey's symptoms remained unchanged, except that she reported that her energy level was poor, and she endorsed symptoms of anhedonia. (R. at 590.) She also reported excessive worrying to the point of becoming nauseated and vomiting. (R. at 589.) Dr. Puthuvel's findings, diagnosis and GAF assessment remained unchanged except for some impairment of long-term memory. (R. at 591.)

It appears that Foster-McVey did attend at least one follow-up therapy appointment with Highlands Community Services after the cutting incident, (R. at 579), but she then missed a number of counseling sessions, and she was discharged from care. (R. at 579-80.) She returned for treatment on December 22, 2011, and another treatment plan was drafted. (R. at 581-82, 595-96.) In this treatment plan, it was noted that Foster-McVey expressed feelings of being overwhelmed and unable to meet her current life demands. (R. at 595.) She returned for individual therapy on January 5, 2012, and February 2, 2012. (R. at 897-99.) On February 2, she reported that she had been sick and in bed since her previous visit. (R. at 899.) Her case was again closed for failure to attend appointments sometime before March 11, 2012. (R. at 900.)

-20-

Dr. Puthuvel saw her again on January 4, 2012. (R. at 591-94.) On this occasion, Foster-McVey reported being off of her lithium for two weeks, with wosening mood. (R. at 592.) She reported recently becoming upset at her boyfriend and jumping out of the car when it stopped at a traffic light. (R. at 592.) She also wanted Dr. Puthuvel to complete disability forms. (R. at 592.) Otherwise, her complaints, symptoms and findings were consistent with her previous visit, except that her mood was listed as "tired." (R. at 592-93.) Dr. Puthuvel restarted her on lithium. (R. at 593.) On January 9, 2012, Dr. Puthuvel also prescribed divalproex for Foster-McVey based on a telephone consultation. (R. at 594.)

Dr. Puthuvel completed an assessment of Foster-McVey's anxiety-related disorder on this date, stating that she exhibited generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity, apprehensive expectation and vigilance and scanning; that she exhibited a persistent irrational fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity or situation; that she experienced recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom, recurring, on the average, of at least once a week; and that she experienced recurrent and intrusive recollections of a traumatic experience which are a source of marked distress. (R. at 599-601.) Dr. Puthuvel also stated that Foster-McVey suffered from manic syndrome with hyperactivity, pressured speech, flight of ideas, inflated self-esteem, decreased need to sleep, easy distractibility, involvement in activities that have a high probability of painful consequences which are not recognized and hallucinations, delusions or paranoid thinking. (R. at 600.) Dr. Puthuvel wrote that her anxiety had been so severe in the past, that it prevented her from seeing her child for routine visitation. (R. at 601.) He said that she reported panic attacks if she had to go shopping. (R. at 601.) Dr.

-21-

Puthuvel also stated that she would have difficulty maintaining a job. (R. at 601.) Oddly, most of the symptoms mentioned in this assessment are either not mentioned in Dr. Puthuvel's office notes or are directly contradicted by the office notes.

Dr. Puthuvel also completed an assessment of Foster-McVey's depressive disorder on January 4, 2012. (R. at 906-09.) Dr. Puthuvel noted that she suffered from a disturbance of mood accompanied by full or partial depressive syndrome with anhedonia or pervasive loss of interest in almost all activities; appetite disturbances with a change in weight; sleep disturbance; decrease energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; and paranoid thinking. (R. at 906.) He also noted that Foster-McVey suffered from manic syndrome characterized by hyperactivity; pressured speech; flight of ideas; inflated self-esteem; decreased need to sleep; easy distractibility; involvement in activities that have a high probability of painful consequences which are not recognized; and paranoid thinking. (R. at 907.) He stated that she suffered from bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndrome. (R. at 907.) Dr. Puthuvel stated that Foster-McVey's mental disorder caused no restrictions on her activities of daily living and marked difficulties in social functioning and concentration, persistence or pace. (R. at 908.) He stated that he had never treated her while she was working, so he had insufficient evidence to determine whether she had ever suffered deterioration or decompensation in work or work-like settings. (R. at 908.) He did note that he believed her current condition would impair her ability to work at a competitive level. (R. at 909.) Again, many of the symptoms mentioned in this assessment are either not mentioned in Dr. Puthuvel's office notes or are directly contradicted by the office notes.

Foster-McVey returned for follow-up care with Dr. Banks on December 7, 2011, for her gastroesophageal reflux disease, vertigo and hypothyroidism. (R. at 552-54.) She complained of right side pain for about a week, worse after eating. (R. at 552.) She also said that she was not sleeping at night. (R. at 552.) On this occasion, Foster-McVey's weight was recorded as 254 pounds. (R. at 552.) Dr. Banks noted that Foster-McVey previously had complained of left-sided epigastric pain. (R. at 552.) She also complained of lots of spasms and cramping in her abdomen. (R. at 552.) Foster-McVey claimed that Klonopin helped with her abdominal pain. (R. at 552.)

Foster-McVey returned to Dr. Banks on December 21, 2011, complaining of nausea and vomiting for about two weeks with headaches. (R. at 555-57.) She said that she could not keep anything in her stomach. (R. at 555.) She said that she was seeing "spots" with her headaches. (R. at 555.) Dr. Banks diagnosed a urinary tract infection and ordered a urine culture, which was negative for growth. (R. at 556-57, 559.)

On February 2, 2012, Foster-McVey was seen at the JMH emergency department for complaints of right wrist pain for the past two years. (R. at 605-07.) The examining physician noted a 1-centimeter soft cystic structure in the radial side of her wrist. (R. at 607.) He gave her a prescription for Lortab and advised her to follow up with an orthopedic doctor. (R. at 607.) An x-ray of her wrist showed no abnormality. (R. at 605.)

Foster-McVey was seen at Walnut Grove Family Medicine on May 1, 2012, for regular follow up with complaints of her heart skipping at times. (R. at 962-65.) She said that she was under a lot of stress at home, and symptoms usually occurred

-23-

when under stress. (R. at 962.) Her blood pressure was 130/88. (R. at 962.) She also complained of panic attacks, decreased ability to concentrate and low back pain radiating into right buttock and leg. (R. at 963.) She returned on July 20, 2012, complaining of left-sided chest pain for about three months and worsening asthma. (R. at 952-53.) She also complained of diarrhea and right upper quadrant pain caused by fatty foods. (R. at 953.) She was seen again on December 27, 2012. (R. at 948-51.) She was diagnosed with joint pain localized in the shoulder, hypertension and hypothyroidism. (R. at 950.)

On January 27, 2013, Foster-McVey sought treatment at the JMH emergency department for left shoulder pain, swelling in the left hand and nausea and vomiting. (R. at 910-13.) An ultrasound of her left arm was normal, (R. at 919), as were x-rays of her chest and left shoulder. (R. at 920, 923.)

On October 26, 2011, Robert Keeley, a state agency medical consultant, opined that Foster-McVey could perform medium work. (R. at 97.) No postural, manipulative, visual, communicative or environmental limitations were noted. (R. at 97.)

On October 27, 2011, Andrew Bockner, M.D., a state agency physician, completed a Psychiatric Review Technique form, ("PRTF"), finding that Foster-McVey suffered from an affective disorder, an anxiety-related disorder and a personality disorder. (R. at 95-96.) He opined that Foster-McVey was mildly restricted in her ability to perform her activities of daily living and moderately restricted in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 95.) Dr. Bockner opined that Foster-McVey had not experienced repeated episodes of decompensation of extended duration. (R. at 95.)

-24-

Dr. Bockner also completed a Mental Residual Functional Capacity Assessment, stating that Foster-McVey was not significantly limited in her ability to remember locations and work-like procedures; to understand, remember and carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to make simple work-related decisions; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to ask simple questions or request assistance; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to be aware of normal hazards and take appropriate precautions; and to set realistic goals and make plans independently of others. (R. at 97-100.) He opined that Foster-McVey was moderately limited in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to travel in unfamiliar places or use public transportation. (R. at 98-99.) Dr. Bockner stated that Foster-McVey would be able to understand and concentrate sufficiently to perform one-to-two step tasks. (R. at 98.) He said she should be able to work at least two hours at a time between breaks and complete simple tasks. (R. at 99.)

On July 16, 2012, Louis Perrott., Ph.D., a state agency psychologist, completed a PRTF finding that Foster-McVey suffered from an affective disorder,

mental retardation, an anxiety-related disorder and a personality disorder. (R. at 111-12.) He opined that Foster-McVey was mildly restricted in her ability to perform her activities of daily living and moderately restricted in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 112.) Perrott opined that Foster-McVey had not experienced repeated episodes of decompensation of extended duration. (R. at 112.)

Perrott also completed a Mental Residual Functional Capacity Assessment, stating that Foster-McVey was not significantly limited in her ability to remember locations and work-like procedures; to understand, remember and carry out very short and simple instructions; to make simple work-related decisions; to ask simple questions or request assistance; and to be aware of normal hazards and take appropriate precautions; that she was moderately limited in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to other without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others; and that she was markedly limited in her ability to interact appropriately with the

-26-

general public, (R. at 115-17.) Perrott stated that Foster-McVey would be able to perform simple one-to-two step instructions. (R. at 116.) He said she should be capable of sustaining two-hour intervals of concentration at a time. (R. at 116.) He also noted that she needed encouragement to get out of bed and bathe, but there had been no comments regarding lack of personal hygiene in her medical records. (R. at 117.) He stated she could maintain minimal interaction with others at work and that she had a low stress tolerance. (R. at 117.) Perrott opined that Foster-McVey was capable of the basic mental demands of routine, competitive work on a consistent basis. (R. at 117.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating SSI claims.  *See* 20 C.F.R. § 416.920 (2015); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).  This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work.  *See* 20 C.F.R. § 416.920.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step.  *See* 20 C.F.R. § 416.920(a) (2015).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age,

education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Foster-McVey argues that the ALJ erred by failing to provide any analysis as to how her condition did not meet a finding of disability due to mental retardation under Listing 12.05. (Plaintiff's Brief – Social Security, ("Plaintiff's Brief"), at 4-9.) She also argues that the ALJ erred by not adequately addressing her moderate limitation in concentration, persistence and pace. (Plaintiff's Brief at 10-15.) She further argues that the ALJ erred by not giving appropriate weight to the opinions of her treating psychiatrist. (Plaintiff's Brief at 15-19.)

The ALJ found that Foster-McVey suffered from the severe impairment of borderline intellectual functioning, but he found that this impairment did not meet or equal one of the listed impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-17.) The ALJ specifically found that Foster-McVey's mental impairment did not meet the listed impairment for mental retardation because, while it had resulted in marked difficulties in maintaining social functioning, it had not resulted in marked restrictions of activities of daily living or marked difficulties in maintaining concentration, persistence or pace. (R. at 16.) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.05(D) (2016). This finding is supported by the substantial evidence of record contained in the assessments of Miller and Spangler, Dr. Bockner and Perrott.

The ALJ also found that Foster-McVey had the mental residual functional capacity to perform simple, easy-to-learn, repetitive, unskilled work, that required

-28-

no interaction with the public and that required no more than occasional interaction with co-workers and supervisors in a static work environment with few changes in work routines and settings. (R. at 17-19.) Earlier in his opinion, the ALJ, at step four, found that Foster-McVey had moderate difficulties in concentration, persistence or pace. (R. at 16.) Foster-McVey argues that the ALJ did not appropriately address his conceded "moderate limitations" in "concentration, persistence or pace" by means of a limitation referring to simple, easy-to-learn, repetitive, unskilled work. (Plaintiff's Brief at 10-15.) Foster-McVey contends that the ALJ did not pose an adequate hypothetical question that included her moderate limitations of maintaining concentration, persistence and pace to the vocational expert. She cites *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2105) in support of her argument.

In *Mascio*, the Fourth Circuit held that an ALJ does not generally account for a claimant's limitations in concentration, persistence and pace by restricting the hypothetical question to simple, routine tasks or unskilled work. *See Mascio*, 780 F.3d at 638. The court noted that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Mascio*, 780 F.3d at 638; *see also Sexton v. Colvin*, 21 F. Supp. 3d 639, 642-43 (W.D. Va. 2014) (citing *Wiederholt v. Barnhart*, 121 F. App'x 833, 839 (10th Cir. 2005) (holding that a "limitation to simple, unskilled work does not necessarily" accommodate a person's difficulty in concentrating on or persisting in a task, or maintaining the pace required to complete a task)). In *Mascio*, the Fourth Circuit found that the ALJ did not explain why Mascio's moderate limitation in concentration, persistence or pace did not translate into a limitation in his residual functional capacity. The court noted, however, that the ALJ may find that the concentration, persistence or pace

-29-

limitation would not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert. *See Mascio*, 780 F.3d at 638; *see also Hutton v. Colvin*, 2015 WL 3757204, at *3 (N.D. W. Va. June 16, 2015).

*Mascio* does not broadly dictate that a claimant's moderate impairment in concentration, persistence or pace always translates into a limitation in the residual functional capacity. Rather, *Mascio* underscores the ALJ's duty to adequately review the evidence and explain the decision, especially where, as the ALJ held in *Mascio*, a claimant's concentration, persistence or pace limitation does not affect the ability to perform simple, unskilled work. The ALJ has the responsibility to address the evidence of record that supports that conclusion.

The *Mascio* court relied upon *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011), where the court rejected the argument that an ALJ generally accounts for a claimant's limitations in concentration, persistence and pace by restricting the claimant to simple, routine tasks or unskilled work. However, the *Winschel* court explained that:

> But when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations…. Additionally, other circuits have held that hypothetical questions adequately account for a claimant's limitations in concentration, persistence, and pace when the questions otherwise implicitly account for these limitations.

-30-

631 F.3d 1180. Courts within the Fourth Circuit have come to rely upon *Winschel's* reasoning to comply with *Mascio*. *See Gardner v. Colvin*, 2015 WL 1508835, at *8 (D. Md. Mar. 31, 2015).

The *Winschel* court relied upon several other circuits which have held that an ALJ may exclude a moderate limitation in concentration, persistence and pace from either the residual functional capacity or the hypothetical presented to the vocational expert where the evidence reflects that the claimant can perform simple, unskilled work. *See Simila v. Astrue*, 573 F.3d 503, 521-22 (7th Cir. 2009); *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1173-76 (9th Cir. 2008); *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001); *see also Wiederholt*, 121 F. App'x 833. Additionally, other courts have held that an ALJ may adequately address a claimant's limitations in concentration, persistence and pace through hypothetical questions presented to the vocational expert which include evidence or opinions that account for these limitations. *See e.g., Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001) (finding that the ALJ did not err by failing to include deficiencies in concentration, persistence or pace where the hypothetical incorporated concrete restrictions identified by examining psychiatrist regarding quotas, complexity and stress).

For example, in *Stubbs-Danielson*, the court affirmed the residual functional capacity which limited the claimant to "simple, routine, repetitive sedentary work, requiring no interaction with the public" despite having moderate limitations in concentration, persistence or pace where the state agency reviewing psychologist found that, despite the claimant's slow pace and moderate limitations in other mental areas, she retained the ability to carry out simple tasks. 539 F.3d at 1173-76. Likewise, in *Howard*, the court explicitly rejected a claim that an ALJ's

Case 1:15-cv-00011-PMS   Document 19   Filed 09/28/16   Page 31 of 33   Pageid#: 1144

hypothetical describing an ability to do "simple, routine, repetitive work" failed to capture deficiencies in concentration, persistence or pace where the state agency psychologist concluded that the claimant, despite certain pace deficiencies, retained the ability to do simple, repetitive, routine tasks. 255 F.3d at 582.

Thus, *Mascio* reiterates the long-held proposition that substantial evidence in the record support the limitations contained in the residual functional capacity and included in the hypothetical question presented to the vocational expert. An ALJ may account for a claimant's limitation with concentration, persistence or pace by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations or other evidence that is sufficiently evident to the reviewing court.

Here, substantial evidence exists to support the ALJ's conclusion that Foster-McVey was capable of performing short, simple job instructions, despite her moderate limitation in concentration, persistence or pace. Miller and Spangler specifically found that Foster-McVey's ability to sustain concentration and persistence was adequate. (R. at 428.) Dr. Bockner found that Foster-McVey would be able to concentrate sufficiently to perform one-to-two step tasks. (R. at 98.) Also, state agency psychologist Perrott found that she was capable of the basic mental demands of routine competitive work on a consistent basis. (R. at 117.)

Insofar as Dr. Puthuvel's opinions contradict the ALJ's finding on this issue, I find that substantial evidence of record supports the ALJ's rejections of Dr. Puthuvel's opinions. The ALJ stated that he was assigning little weight to Dr. Puthuvel's opinions regarding Foster-McVey's work-related mental abilities

because the objective findings did not support the severe limitations he imposed. (R. at 19.) For instance, Dr. Puthuvel noted that Foster-McVey would be easily distracted and that she had marked difficulties in concentration. (R. at 907-08.) Dr. Puthuvel's treatment notes, however, repeatedly state that Foster-McVey was attentive. (R. at 585, 587, 590, 592.) Also, as stated above, many of the other opinions expressed by Dr. Puthuvel are specifically contradicted by his treatment notes. In particular, Dr. Puthuvel repeatedly noted that Foster-McVery reported that her energy level was poor, (R. at 584, 587, 590, 592), that she was calm with no psychomotor agitation, (R. at 585, 587, 590, 592), and exhibited good judgment. (R. at 585, 588, 591, 593.) Despite these findings, Dr. Puthuvel stated that Foster-McVey experienced hyperactivity, (R. at 600, 907), and was involved in activities that had a high probability of painful consequences which were not recognized, i.e. she exhibited poor judgment. (R. at 600, 907.)

Based on the above reasoning, I find that substantial evidence exists in the record to support the ALJ's finding that Foster-McVey was not disabled and not entitled to benefits. An appropriate Order and Judgment will be entered.

DATED:     September 28, 2016.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE